IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

SHEHAN WIJESINHA,
*individually and on behalf of a class of*
*others similarly situated,*

       Plaintiff,

          v.                         Case No. 1:18-cv-24134-CMA

FAITH AND FREEDOM COALITION, INC.;

       Defendant.

_____

## DEFENDANT'S COMBINED MOTION TO DISMISS FIRST AMENDED COMPLAINT (DE 31), WITH PREJUDICE, AND MOTION TO STAY PROCEEDINGS PENDING PRIMARY JURISDICTION REFERRAL, WITH SUPPORTING MEMORANDA OF LAW

      Defendant, Faith and Freedom Coalition, Inc. ("FFC"), pursuant to Fed. R. Civ. P. 12(b)(6), Local Rule 7.1(a)(1) and Florida's Anti-SLAPP Statute, Fla. Stat. § 268.295 (2018), hereby moves to dismiss the Amended Complaint (ECF 31) for failure to state a claim on which relief could be granted.[1] As alternative relief, to the extent the Court has doubts about the inapplicability of the Telephone Consumer Protection Act of 1991 (TCPA) to the particular delivery system and methodology utilized by FFC to communicate with Plaintiff, FFC moves that the Court stay these proceedings pending a primary jurisdiction referral to the Federal Communications Commission ("FCC") for its determination of a pending petition on the matter at issue in this case.

---

[1] To the extent that this Court must rely upon materials outside of the Complaint, such as the Declaration of Gerrit Lansing attached hereto as Exhibit A, FFC respectfully requests the Court treat its motion as one for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(b)*; Carter v. Stanton*, 405 U.S. 669, 671 (1972) (per curiam); *Day v. Taylor*, 400 F.3d 1272, 1275-76 (11th Cir. 2005); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 154 (2d Cir. 2002).

## I.    FACTUAL ALLEGATIONS

Plaintiff alleges that FFC is a 501(c)(4) nonprofit organization whose goals are to "influence public policy and enact legislation that strengthens families, promotes time-honored values, protects the dignity of life and marriage, lowers the tax burden on small business and families, and requires government to tighten its belt and live within its means." Amended Complaint ¶¶ 8, 15. The Amended Complaint alleges that FFC placed, or caused to be placed, text messages to Plaintiff's cellular telephone on September 25, 27, and 29 and on October 27, 2018. Amended Complaint ¶¶ 26-27. Plaintiff alleges that these text messages stated "this is Ralph Reed. A good man is under attack & needs your help. Call Sen Bill Nelson TODAY & tell him to confirm Brett Kavanaugh. 202-871-1612". *Id.* at ¶ 26.

The Amended Complaint further alleges that on October 31, 2018, Plaintiff responded to one of these text messages with the word "STOP." Amended Complaint ¶ 28. Plaintiff alleges that he immediately received a message that read, "You have successfully been unsubscribed. You will not receive any more messages from this number. Reply START to resubscribe." *Id*. The Amended Complaint alleges that at some un-stated later time, FFC texted Plaintiff from a different phone number stating "Hi, it's Ralph Reed. Before you vote in FL, read and share our Faith & Freedom voter guide: FFCoalition.com/wp-content/uploads/2018/10/FL-01-W.pdf". Amended Complaint ¶¶30. According to the Amended Complaint, Plaintiff allegedly again responded with "STOP" "and immediately received a message confirming he was unsubscribed." Amended Complaint ¶ 31.

Plaintiff further states that "At no point in time did Plaintiff provide Defendant with his express consent to be contacted by telephone using an ATDS" and "To the extent that Defendant had express consent to contact Plaintiff using an ATDS – it did not - that consent

was expressly revoked when Plaintiff responded "STOP" on October 31, 2018." Amended Complaint ¶¶ 34-35.

The Amended Complaint does not assert how any of these text messages were sent via an ATDS, nor does it state how such an inference may be made.[2] Instead, the Amended Complaint alleges, without support or explanation, that Plaintiff used an ATDS to send the text messages, while acknowledging that a human uploaded telephone numbers into the system and programmed the dialer. Amended Complaint ¶ ¶45-46. Nonetheless, the Amended Complaint concludes that such text messages violate the TCPA. *Id. at ¶ 66; 47* U.S.C. § 227(b)(1)(A)(iii). The Amended Complaint therefore demands actual and statutory damages "and/or trebled statutory damages," pursuant to the TCPA, for the named Plaintiff and others similarly situated. Amended Complaint ¶¶ a.-e.

## II.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND INCORPORATED MEMORANDUM OF LAW

Defendant FFC moves to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The Amended Complaint fails to state a claim upon which relief can be granted because the conduct complained of is not regulated by the statute underlying the Plaintiff's claim, 47 U.S.C. § 227 *et seq.*, (the Telephone Consumer Protection Act of 1991, or the "TCPA") and because the TCPA is facially unconstitutional.[3] Specifically, Defendant's alleged conduct is not regulated by the TCPA because the text messages Plaintiff complains of were not initiated by an automatic telephone dialing system ("ATDS") and regardless of Plaintiff's alleged conduct, the TCPA violates the First Amendment because the TCPA's prohibitions on telephone calls that either are dialed automatically rather than

---

[2] Plaintiff does not incorporate any portion of the Complaint into the Amended Complaint by reference.
[3] This Motion to Dismiss raises a facial constitutional challenge to the TCPA. If Plaintiff's claims survive this motion, Faith and Freedom will consider challenging the constitutionality of the TCPA as applied in this case after taking discovery

manually, *id.* § 227(b)(1)(A)(iii) (the "Autodialer Ban"), or that convey a prerecorded message, *id.* § 227(b)(1)(A)(iii), (B) (the "Prerecording Ban") are: overinclusive, underinclusive, and not the least restrictive means by which to further government interests. Under the Overbreadth Doctrine, the unconstitutionality of a portion of the TCPA—even a portion that is not necessarily at issue in the instant case—renders the entire statute invalid and unenforceable.[4]

Further, the speech that Plaintiff seeks to throttle pertains to issues of public participation. Such restriction would violate Florida's anti-Strategic Lawsuits Against Public Participation ("Anti-SLAPP Statute") Fla. Stat. § 768.295 (2018), *et seq.* As such, Plaintiff is entitled to relief thereunder.

### A.    Rule 12(b)(6) Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "The Court's consideration is limited to the allegations presented. All factual allegations are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. Nevertheless, while a plaintiff need not provide detailed factual allegations, the allegations must consist of more than 'a formulaic recitation of the elements of a cause of action." *Leon v. Cont'l AG,* 2017 U.S. Dist. LEXIS 218904 *13 (S.D. Fla. 2017) (internal citations and quotations omitted). "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines,* Inc., 326 F.3d 1183, 1185 (11th

---

[4] As noted above, this Motion raises a facial challenge to the TCPA. If necessary, FFC will file an as-applied challenge after the parties have taken discovery and developed evidence of the facts underlying the effects of the TCPA on Faith and Freedom's right to speak freely on public matters.

Cir. 2003). The "[f]actual allegations must be enough to raise a right of relief above the speculative level." *Watts v. Fla. Intl Univ.,* 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting Twombly, 550 U.S. at 545).

Although courts "should freely give leave [to amend a pleading] when justice so requires," Fed. R. Civ. P. 15(a)(2), dismissal with prejudice is appropriate "if a more carefully drafted complaint could not state a claim." *Hayes v. Asset Acceptance,* No. 13-81143—CIV, 2014 WL 1767106, at *3 (S.D. Fla May 2, 2014); *see also Knight v. Mueller,* No. 08-23478-CIV, 2010 WL 11504340, at *4 (S.D. Fla. Jan. 26, 2010) (holding that dismissal with prejudice of Plaintiff's complaint was appropriate, as the conclusion was based upon settled governing law and not necessarily upon specific factual allegations that were or could have been made in the Complaint; thus an amendment could not cure its deficiencies).

**B.    Plaintiff's Amended Complaint Fails To State A Claim Because It Does Not Allege Any Plausible Set Of Facts That Would Show FFC's Communications Were Sent Using An ATDS.**

Plaintiff's allegations do not support an inference that FFC's text communication was sent using an ATDS, as Plaintiff has not satisfied the burden as described above. The TCPA makes it "unlawful . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service . . . for which the called party is charged for the call." 47 U.S.C. § 227(b)(1)(A). The Act was Congress's response to an outpouring of concern in the late 1980s and early 1990s over abusive practices by telemarketers, who used certain computerized equipment that would generate numbers to be called at random or in a particular sequence. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 744 (2012) (noting that Congress passed the TCPA in response to

voluminous consumer complaints about abuses of telephone technology). In light of its concern over telemarketers' use of random and sequential number generators, Congress sought to restrict the use of particular "telecommunications equipment." H.R. Rep. No. 102-317, at 5 (1991). The Act accomplished this by sharply curbing the use of what it called an "automated telephone dialing system" or ATDS.

An ATDS is not just any computerized telephone; instead, the TCPA defines an ATDS as equipment that can "store or produce telephone numbers to be called, using a random or sequential number generator . . . and . . . dial such numbers." 47 U.S.C. § 227 (a)(1). *See also ACA Intl v. FCC,* 885 F.3d 687 (D.C. Cir. 2018).

In its 2015 ruling, the FCC reaffirmed that "the basic functions of an autodialer are to '*dial* numbers *without human intervention' and to* 'dial thousands of numbers in a short period of time.' " *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278, Declaratory Ruling and Order, 30 FCC Rcd. 7961, 7974, ¶ 17 (rel. Jul. 10, 2015) *("TCPA Declaratory Ruling")* (emphasis added) (citations omitted). Plaintiff's efforts to plead bulk dialing (Amended Complaint ¶37-51) essentially restate the elements of a TCPA offense, without support and in direct contradiction of facts provided by Defendant to Plaintiff. Plaintiff, therefore, has not pleaded ATDS as a matter of law.

But even if Plaintiff had alleged bulk dialing, that allegation alone would still not be sufficient to constitute ATDS. The TCPA only covers "equipment that has the specified capacity to generate numbers and dial them *without human intervention."* 27 FCC Rcd. 15391, 15392, n. 5 (2012) (emphasis added). And case law confirms that where a communication application's subscribers cannot initiate messages except through their own human intervention, the application platforms are not ATDS as a matter of law. *See, e.g. ACA Intl v. FCC,* 885 F.3d 687, 703 (D.D. Cir. 2018) ("[T]he 'basic function' of an autodialer is the

ability to 'dial numbers without human intervention.' 2015 Declaratory Ruling, 30 FCC Rcd. at 7973 ¶ 14; *id.* at 7975 ¶ 17. Prior orders had said the same. 2003 Order, 18 FCC Rcd. at 14092 ¶ 132; 2008 Declaratory Ruling, 23 FCC Rcd. at 566 ¶ 13. That makes sense given that 'auto' in autodialer—or, equivalently, 'automatic' in 'automatic telephone dialing system,' 47 U.S.C. § 227(a)(1)—would seem to envision non-manual dialing of telephone numbers.")

Here, Plaintiff contends that FFC "placed, or caused to be placed, . . . automated text message[s] to Plaintiff's cellular telephone number . . . ." Amended Complaint ¶¶ 26-27. The Amended Complaint fails to support the assertion that these text messages were sent using an ATDS and any statement in the Amended Complaint that may be construed as supporting this assertion is mere conjecture or wholly unsupported. Even more, Plaintiff tellingly abandons the argument presented in his unamended complaint that the subject text messages were sent using a "long code" phone number to couch the claim that an ATDS was used. That is because that argument is unfounded. Indeed, the use of a traditional 10-digit phone number is not at all indicative of the use of an ATDS as compared to other methods. The fact that these phone numbers are not obscured or shortened cuts against Plaintiff's argument that an ATDS was used.

Second, as discussed at length and repeatedly with Plaintiff's counsel, FFC does not utilize an ATDS, but rather utilizes a peer-to-peer texting program. As set forth in the Declaration of Gerrit Landsing, attached hereto as Exhibit A, the Opn Sesame peer-to-peer program is not an ATDS, because it requires human intervention ("Landing Decl."). Each phone number dialed by a human operator is provided by the client. Lansing Decl. ¶7. The text message system does not have the ability to automatically generate phone numbers; nor does it have a random or sequential number generator. *Id.* Each human operator must manually cause each message to be sent through Opn Sesame's P2P text message system.

*Id.* Accordingly, every text message that is initiated from FFC's system required at least one click by a human in order to be sent. It is not possible for FFC's peer-to-peer texting program to automatically initiate text messages to multiple numbers without human intervention. *Id.* Because human intervention is required in order to initiate text messages, the use of FFC's system cannot be a violation of the TCPA. In an effort to come to an amicable conclusion to this litigation, FFC's counsel and programmers discussed this fact at great length with Plaintiff's counsel. While there are numerous additional factual additions to the Amended Complaint, any mention of the peer-to-peer nature of FFC's texts is tellingly absent from the Amended Complaint.

Nevertheless, Plaintiff in his Amended Complaint appears to allege that the unsubscribe option and the confirmation message somehow qualifies FFC's peer-to-peer program as an ATDS. *See* Amended Complaint ¶¶ 28, 30, 35. This is simply a mischaracterization and misapplication of the TCPA. A Sender initiated the text messages on behalf of FFC using its peer-to-peer program. The Plaintiff then replied to those text messages. Only after Plaintiff replied to the messages sent by the Sender—by sending a text of his own and initiating a dialogue with the human who sent the original text message— were the replies sent to Plaintiff. Moreover, as set forth in the Lansing Declaration, the P2P text message system does not offer the capability to "auto-respond" to any message received in response from a recipient. Gerrit Decl. ¶ 11. Even assuming for the sake of argument that those messages were automated, it is apparent from the allegations of the Amended Compliant that they were not initiated by an ATDS but were initiated by Plaintiff's reply. Amended Complaint ¶44;  *see ACA Int'l,* 885 F.3d at 703 ("[T]he 'basic function' of an autodialer is the ability to 'dial numbers *without human intervention*.' . . . . That makes sense given that 'auto' in autodialer—or, equivalently, 'automatic' in 'automatic telephone dialing

system,' 47 U.S.C. § 227(a)(1)—would seem to envision non-manual dialing of telephone numbers.") (emphasis added). Even more, it is only logical that once a recipient, such as the Plaintiff, sends a text message to a telephone number, he or she will, in turn, receive a response text. A person initiated the initial texts to Plaintiff; Plaintiff replied to those initial messages, prompting a message from FFC. Assuming arguendo that the unsubscribe message was sent from some kind of automated system, human intervention was necessary for its transmission: Plaintiff's reply text message. If this is not the case, then every auto-reply text message function present on every iPhone would be violative of the TCPA. Surely, such an outcome was not Congress's intent in passing this statute.

## C. The Statute Plaintiff's Claim Relies On, the TCPA, Is Facially Unconstitutional

If the Court concludes that the TCPA nevertheless reaches the speech at issue here, it should hold that the TCPA violates the First Amendment as a content-based restriction of speech that cannot survive strict scrutiny. U.S. Const. Amend I. A restriction of speech is "content-based" on its face when it draws distinctions based on the message a speaker conveys. *Reed v. Town of Gilbert,* 135 S. Ct. 2218, 2227 (2015). As the Supreme Court recently reiterated, content-based restrictions of speech are "presumptively unconstitutional," *id.* at 2226, and subject to "the most exacting standard of review," *id.* at 2237 (Kagan, J., concurring), no matter "the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech," *id.* at 2228 (quoting *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 429 (1993)).

### i.   The Overbreadth Doctrine Generally

The Supreme Court of the United States has recognized the Overbreadth Doctrine—under which an entire statute may be invalidated due to a First Amendment defect in only one portion of the statute—to ensure that constitutionally protected speech is not chilled.

To invalidate a statute as a whole under the Overbreadth Doctrine, a litigant must show that the statute "[p]unishes a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks,* 539 U.S. 113, 118-19 (2003). Stated differently, a court will invalidate an entire statute under the Overbreadth Doctrine if the litigant establishes that, although the statute may be constitutionally applied in some circumstances, the statute is so broad that there is "a realistic danger that the statute itself will significantly compromise recognized *First Amendment* protections." *N.Y. State Club Ass'n Inc. v. City of New York,* 487 U.S. 1, 14 (1988).

In bringing a challenge under the Overbreadth Doctrine, a litigant need not argue that the statute is unconstitutional as applied to the litigant directly, but may instead rely on unconstitutional applications of the statute to third parties that are not before the court.[5] *See id.* at 11 ("[T]o prevail on a facial attack the plaintiff must demonstrate that the challenged law . . . even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it may inhibit the constitutionally protected speech of third parties." (internal quotation marks omitted)). A movant brings an Overbreadth Doctrine challenge to a statute that prohibits speech not simply for the benefit of the movant, but also "to prevent the statute from chilling the *First Amendment* rights of other parties not before the court." *Sec 'y of Md. v. Joseph H Munson Co., Inc.,* 467 U.S. 947, 958 (1984)). To protect the constitutional right to freedom of speech, the expansive remedy of complete invalidation of the statute is provided out of a concern that the "[t]hreat of an enforcement of an overbroad law may deter or chill constitutionally protected speech." *Hicks,* 539 U.S. at 119. Withholding constitutionally protected speech from the marketplace of ideas injures all citizens. *Id.*

---

[5] As noted above, this Motion raises a facial challenge to the TCPA. If necessary, FFC will file an as-applied challenge after the parties have taken discovery and developed evidence of the facts underlying the effects of the TCPA on Faith and Freedom's right to speak freely on public matters.

Because the TCPA is substantially overbroad and significantly infringes on the First Amendment rights of FFC and others not presently before this Court, as discussed below, the TCPA as a whole is invalid under the Overbreadth Doctrine.

ii.     *Citizens United* And *Reed* Altered The Analysis For Whether Strict Scrutiny Applies To Statutes That Ration Speech

The *Citizens United* Court's foundational premise was that the First Amendment prohibits statutes that ration speech based on the identity of the speaker. *See Citizens United,* 558 U.S. at 350; *see also id.* at 394 (Stevens, J., dissenting) ("The basic premise underlying the Court's ruling is its iteration, and constant reiteration, of the proposition that the First Amendment bars regulatory distinctions based on a speaker's identity.") This premise is not new. *See, e.g., First Nat'l Bank,* 435 U.S. at 777 ("The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual.") *See also* Michael Kagan, *Speaker Discrimination: The Next Frontier of Free Speech,* 42 Fla. St. U. L. Rev. 765, 766 (2015).

Similarly, in *Reed,* the Supreme Court stated that the crucial first step in analyzing whether a statute offends the First Amendment is determining whether a statute is facially content-based. If it is, regardless of motive or justification, strict scrutiny applies. *See Reed v. Town of Gilbert,* 135 S. Ct. 2218, 2228 (2015).

In *Citizens United v. FEC,* the Supreme Court reviewed a federal statute that—in the context of federal elections—banned corporations and unions from speaking. 558 U.S. at 318-19. However, individuals were not similarly limited in their express advocacy speech. *See Buckley v. Valeo*, 424 U.S. 1, 51 (1976). In *Citizens United*, the Supreme Court declared that Congress's statute imposing a ban created an unconstitutional distinction based on the identity of

the speaker—corporations and unions—from making independent expenditures and electioneering communications.

Because "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution[,]" laws that restrict speech must be subject to strict scrutiny. *Id*. at 14; *see also Citizens United*, 558 U.S. at 340. The need for strict scrutiny review is further supported because the First Amendment is "[p]remised on mistrust of governmental power," especially the government's use of the legislative power to "disfavor certain subjects or viewpoints." *See Citizens United*, 558 U.S. at 340. The Supreme Court declared that the First Amendment prohibits statutes that create distinctions based on the identity of the speaker, allowing speech by some speakers but not others. *See id*.; *see also id*. at 341 ("The First Amendment protects speech and speaker, and the ideas that flow from each.")

Rationing speech based on the identity of the speaker is interrelated with the government's ability to ration speech based on the speech's content. *See id.* A state, therefore, violates the First Amendment when the state identifies certain preferred speakers, allowing these preferred speakers to speak but prohibiting others. *See id.* at 341. This injures both the speaker, who is trying to persuade the listener, and society, which is deprived of the speech and the ability to evaluate the merits of that speech because that evaluation has been arrogated to the state. *See id.* Therefore, particularly in the context of political speech, the First Amendment does not permit statutes that impose restrictions that are based on the identity of the speaker. *See id.*

### iii.   *Reed* Altered The Analysis For Determining Whether A Statute Discriminates On The Basis Of Content

Five years after *Citizens United,* the Court in *Reed* declared unconstitutional a statute that made distinctions based on the content of the speaker's speech. The Town of Gilbert

prohibited the placing of signs within town limits without a permit. *Reed,* 135 S. Ct. at 2224. The Sign Code applied differently to Ideological Signs, Political Signs, and Temporary Directional Signs Relating to a Qualifying Event and exempted twenty-three different types of signs. *See id.* Importantly, the Town of Gilbert still permitted people to speak through signs, but, unlike the TCPA's automated call ban, different rules applied to the sign depending upon the content of the speech.

The Court stated that the first step in determining whether a statute is content-based, thereby triggering strict scrutiny, was not whether the purpose of the statute was disagreement over any message conveyed, but rather, the first step is "[w]hether the law is content neutral on its face." *Id.* at 2228. The Court stated that the commonsense meaning of content-based "requires a court to consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys." *Id.* at 2227. Thus, a statute is content-based "[i]f a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id*. at 2227. As the Supreme Court stated prior to *Reed*, a statute is "content based if it require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014).

The Town of Gilbert contended that the statute was content-neutral because it did not "censor or favor particular viewpoints or ideas" and the political or ideological signs "are neutral as to particular ideas or viewpoints within those categories." *See id*. at 2229. The Court rejected this argument, noting that a statute that targets specific subject matter is still content-based regardless of whether the statute has a benign justification or does not discriminate based upon viewpoint. *See id*. at 2229-30. The central point of *Reed*, therefore, is that the first step of the analysis must determine whether the statute at issue, on its face, discriminates based upon the message or topic that the speaker conveys. *See id*. at 2227.

The Court concluded that the Town of Gilbert's Sign Code is facially content-based because the Sign Code's exemptions create distinctions based upon the message the speech conveys. *See id*. The town created different rules for signs that communicated directions to a church event or other "qualifying event." These rules were different from signs that communicated a message designed to influence an election. The Town of Gilbert's rules were different for those signs that communicated speech concerning non-commercial or ideological ideas. *See id*. The Supreme Court provided the following example: that the Sign Code would treat a sign that communicates directions to a meeting to discuss the philosophy of John Locke differently than a sign that endorses the philosophy of John Locke. *See id.* Thus, the Supreme Court concluded, "[t]he restrictions in the Sign Code that apply to any given sign thus depend entirely on the communicative content of the sign." *Id*.

Under *Citizens United* and *Reed,* the Supreme Court has ruled that the First Amendment prohibits statutes that create different rules based upon the identity of the speaker and the content of that speaker's speech. The TCPA applies different rules depending on both the identity of the speaker and the content of the speech. This is in direct contravention to the First Amendment as further explained in *Citizens United* and *Reed.*

### iv.     The TCPA Rations Speech First On The Basis Of The Speaker's Identity And Then On The Basis Of Content

The TCPA's automated call ban—on its face—rations speech according to both the identity of the speaker as well as the content of the speech. Under *Reed* and *Citizens United,* therefore, the TCPA's automated call ban must be subject to strict scrutiny.

The TCPA is plainly content-based because it is riddled with exceptions that allow the government to pick and choose what speech is desirable and what speech is not—the hallmarks of a content-based restriction of speech. *See, e.g., McCullen v. Coakley,* 134 S. Ct.

2518, 2531 (2014) (noting that a statute is content-based "if it require[s] 'enforcement authorities' to `examine the content of the message that is conveyed to determine whether' a violation has occurred" (quoting *FCC v. League of Women Voters of Cal.,* 468 U.S. 364, 383 (1984)). For example, as recently amended, the TCPA exempts from liability a call "made solely to collect a debt owed to or guaranteed by the United States." Bipartisan Budget Act of 2015 § 301(a), Pub. L. No. 114-74, 129 Stat. 584; *see* 47 U.S.C. § 227(b)(1)(A)(iii). It is difficult to imagine a more blatant example of the government choosing speech that it clearly favors for naked financial reasons (debt collection calls about government-issued or government-backed debt) over speech that it does not (any other debt collection call). And the statute empowers the FCC to exempt calls made to a wireless number with an ATDS if the calls "are not charged to the called party" and are "in the interest of the privacy rights this section [was] intended to prevent." *Id.* § 227(b)(2)(C); *see also id.* § 227(b)(2)(B)(ii)(I)  (similar for artificial or prerecorded voice calls to residential telephone lines). The FCC has applied this malleable "privacy" exception to calls about such mundane matters like medical appointment reminders. *See* 2015 Order, 30 FCC Rcd. at 8030. Each of these exceptions requires a court to "'examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen,* 134 S. Ct. at 2531 (quoting *FCC v. League of Women Voters of Cal.,* 468 U.S. 364, 383 (1984)); *see also Reed,* 135 S. Ct. at 2227 (holding that a speech restriction is "content-based" on its face when it "draws distinctions based on the message a speaker conveys"); *Norton v. City of Springfield,* 806 F.3d 411, 412 (7th Cir. 2015) (*"Reed* effectively abolishes any distinction between content regulation and subject-matter regulation. Any law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification.").

Because it is content-based, the TCPA is subject to strict scrutiny. The "purpose of the [strict scrutiny] test is not to consider whether the challenged restriction has some effect in achieving Congress' goal. . . . [but rather] to ensure that speech is restricted no further than necessary to achieve the goal, for it is important to ensure that legitimate speech is not chilled or punished." *Ashcroft v. Am. Civil Liberties Union,* 542 U.S. 656, 666 (2004). "A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Republican Party of Minn. v. White,* 416 F.3d 738, 751 (8th Cir. 2005). Even if the government's interest in promoting privacy is a compelling one, the TCPA, with its vague exceptions, still fails strict scrutiny because it is underinclusive and less restrictive alternatives means of regulation are available to further any government interest.

The TCPA's expansive exceptions render it underinclusive. While Plaintiff complains about an unwanted and allegedly automated notification from FFC, the speech that the TCPA exempts is no different. Texts about medical appointments or prescriptions may be at least as intrusive as texts about a contacting a senator. And, texts about government debt are no less invasive than texts about a Supreme Court nominee. The (increasing) patchwork of exceptions that pocks the TCPA causes it to fail the tailoring prong of strict scrutiny. As was the case in *Reed,* the government "cannot claim that placing strict limits on [some calls] is necessary to [promote privacy] while at the same time allowing unlimited numbers of other types of [calls] that create the same problem." 135 S. Ct. at 2231. A "law cannot be regarded

as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Republican Party,* 536 U.S. at 780.

As the Fourth Circuit recognized in *Cahaly,* there are numerous less restrictive alternatives for "protect[ing] residential privacy and tranquility from unwanted and intrusive robocalls," *Id.* at 405, which are the governmental interests at stake with the TCPA. These "less restrictive alternatives include time-of-day limitations, mandatory disclosure of the caller's identity, or do-not-call lists." *Id.* Each of these would advance Congress's interest in promoting privacy without requiring the government to sift through speech to determine its worth and value. Banning some calls and exempting others may seem like a perfectly rational way to regulate [calls], but a clear and firm rule governing content neutrality is an essential means of protecting the freedom of speech, even if laws that might seem 'entirely reasonable' will sometimes be 'struck down because of their content-based nature.'" *Reed,* 135 S. Ct. at 2231 (quoting *City of Ladue v. Gilleo,* 512 U.S. 43, 60 (1994) (O'Connor, J., concurring)).

### D. Plaintiff's Claim Violates Florida's Anti-SLAPP Law.

Lastly, Defendant is entitled to relief pursuant to Florida's Anti-SLAPP Statute, Fla. Stat. § 768.295, *et seq.* Plaintiff's filing of this action violates Florida's Anti-SLAPP Statute. Actions like Plaintiff's are intended to circumscribe the rights of FFC and other public interest groups to express their opinions in matters of public interest and to encourage others to petition their representatives, such as by urging their senator to vote to confirm a Supreme Court justice. Prevention of this chill on free speech and the right to petition government are at the heart of Florida's Anti-SLAPP Statute.

Florida's Anti-SLAPP Statute expresses the state's strong public policy in support of the constitutional right of free expression in matters of public interest and in opposition to conduct calculated to chill such freedom of expression:

> (1)  It is the intent of the Legislature to **protect the right in Florida to exercise the rights of free speech in connection with public issues,** and the rights to peacefully assemble, **instruct representatives,** and **petition for redress of grievances before the various governmental entities of this state as protected by the First Amendment to the United States Constitution and s. 5, Art. I of the State Constitution.** It is the public policy of this state that a person or governmental entity not engage in SLAPP suits because such actions are inconsistent with the right of persons to exercise such constitutional rights of free speech in connection with public issues. **Therefore, the Legislature finds and declares that prohibiting such lawsuits as herein described will preserve this fundamental state policy, preserve the constitutional rights of persons in Florida, and assure the continuation of representative government in this state.** It is the intent of the Legislature that such lawsuits be expeditiously disposed of by the courts.

Fla. Stat. § 768.295(1) (emphasis supplied).

We have found no federal question case ruling one way or the other with respect to the applicability of *Florida's* Anti-SLAPP Statute. However, this Court has held the rights conveyed to defendants in other state Anti-SLAPP statutes are substantive and therefore applicable in federal court. *Tobinick v. Novella,* 108 F. Supp. 3d 1299, 1305 (S.D. Fla. June 4, 2015) ("California's anti-SLAPP statute protects substantive rights and thus applies in federal court."), *affirmed* 848 F.3d 935 (11th Cir. 2017). [6] And one federal court in this district has granted equivalent relief under Federal law to that available under the Florida Anti-SLAPP Statute, noting "it is not clear" whether the Florida anti-SLAPP statute applies in federal diversity actions. *See Davis v. McKenzie,* 2017 U.S. Dist. LEXIS 183519 (Fla. S.D.

---

[6] In *Tobinick,* the 11th Circuit rejected the plaintiff's attempt to raise an *Erie* argument for the first time on appeal, and thereby affirmed the District Court's ruling that the California anti-SLAPP statute was applicable in federal court. While the 11th Circuit did not reach the merits of the *Erie* argument, it did write "[t]he district court acted reasonably in applying California's anti-SLAPP statute to the state law claims . . . ." *Id.* at 944.

2017) (Magistrate recommended granting the defendant's Florida Anti-SLAPP motion for summary judgment), *recommendation adopted,* 2018 U.S. Dist. LEXIS 9735 (Fla. S.D. Jan. 18, 2018) (Cohn, J.). Other courts, focusing on the Erie Doctrine, have stated an anti-SLAPP statute may apply in a federal action only if it is substantive law. *See Ranbaxy Laboratories, Inc. v. First Databank Inc.,* No. 3:13-cv-859-J-32MCR, 2014 WL 982742, at *5, n.7 (M.D. Fla. Mar. 12, 2014) (declining to apply California anti-SLAPP statute under Florida conflict of laws rules).

Despite some of its procedural aspects, the Florida Anti-SLAPP Statute is a substantive law, because it creates a substantive right on behalf of a person aggrieved by such litigation. Specifically, it provides:

> (3) A person or governmental entity in this state **may not file or cause to be filed,** through its employees or agents, any lawsuit, cause of action, claim, cross-claim, or counterclaim against another person or entity without merit **and** primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue, or right to peacefully assemble, to instruct representatives of government, or to petition for redress of grievances before the various governmental entities of this state, as protected by the First Amendment to the United States Constitution and s. 5, Art. I of the State Constitution.

Fla. Stat. § 768.295(3) (2018) (emphasis supplied).

By virtue of using prohibitive language (**"may not"**) and establishing an intent requirement, it goes far beyond mere procedural concerns and establishes a substantive right to relief. It also creates a substantive statutory right to attorney's fees by the prevailing party and imposes on the state Attorney General an obligation to report any governmental entity violating the statute to the Governor, Cabinet, Speaker of the House and Senate President, with a copy to the affected governmental entity. Fla. Stat. § 768.295(4)-(5); *L. Ross, Inc. v. R. W. Roberts Const. Co., Inc.*, 481 So.2d 484, 485 (Fla. 1986) ("The right to attorney fees is a substantive one, as is the burden on the party responsible for paying the fee.")

Integral to the protection of these constitutional rights is allowing an aggrieved person whose right of free expression or to petition the government (as is the case here) to obtain an expeditious determination "that the claimant's or governmental entity's lawsuit has been brought **in violation of this section."** Fla. Stat. § 768.295(4) (emphasis added). It relies on well-established procedural rules, such as motions to dismiss and motions for summary judgment, as well as the Court's setting of a hearing "as soon as practicable." *Id.* Thus, it presents no conflict with the Federal Rules of Civil Procedure.

Fla. Stat. § 768.295 (3)-(4). Florida's Anti-SLAPP statute applies to discussions of "public issues." Florida Statutes, § 768.295(1) &(2)(a). Subsection 2(a) states that Anti-SLAPP protections extend to "free speech in connection with public issues" . . . "made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work."

The subject of the text messages at issue here—debate over and confirmation of nominees to the United States Supreme Court, as well as contacting U.S. Senators—are inarguably public issues and protected by FFC's constitutional rights to freedom of expression. Plaintiff's claim is seeking to restrict FFC's right of free speech and to petition representatives in government.

The fact that Plaintiff has invoked the Court's federal question jurisdiction here does not preclude application of Florida's Anti-SLAPP Statute. *Cf. Democracy Partners v. Project Veritas Action* Fund, 285 F. Supp.3d 109, 127 (D. D.C. 2018) (D.C. Anti-SLAPP statute with heightened standard of pleading procedural and not applicable under federal question jurisdiction). Nothing in it conflicts with the TCPA. In conjunction with the Court's determination of this Motion, or at a later time on motion for summary judgment, the Court may apply subsection (3) to determine

whether this action was filed "without merit *and* primarily because [FFC] has exercised the constitutional right of free speech." If so, in addition to dismissing the action, the Court "shall" award attorney's fees to FFC as the prevailing party.

## III.   MOTION TO STAY PROCEEDINGS PENDING PRIMARY JURISDICTION REFERRAL AND INCORPORATED MEMORANDUM OF LAW.

As alternative relief, to the extent the Court has doubts about the inapplicability of the TCPA to the particular delivery system and methodology utilized by FFC to communicate with Plaintiff, FFC moves that the Court stay these proceedings pending a primary jurisdiction referral to the FCC for the outcome of a pending petition on the matter at issue in this case. In support thereof, Plaintiff respectfully shows as follows:

### A.   A "Peer-to-Peer" Text Message System Has Never Been Squarely Addressed by the FCC or any Court under the TCPA.

A threshold issue in this case is whether the particular delivery system and methodology utilized by Defendant, by and through its vendor Opn Sesame, LLC ("Opn Sesame"), to send the text messages at issue in this lawsuit is a prohibited automatic telephone dialing system ("ATDS") under the Telephone Consumer Protection Act of 1991, as amended ("TCPA").  As described above, the TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). As FFC, through its counsel, described to plaintiff's counsel during a teleconference on November 2, 2018, the system used by Opn Sesame and its human telephone operators does not have the capacity to dial any telephone numbers without human intervention. As argued *supra*, the Opn Sesame P2P text messaging platform requires human intervention at the critical steps of the messaging function. Lansing Decl. ¶¶ 5-7.

The FCC has not yet directly addressed the type of peer-to-peer system used by Opn Sesame under the TCPA. To the extent that any court has adjudicated whether this type of delivery technology is an unlawful dialer, courts have held that only a system capable of non-manual dialing of telephone numbers are the only ones that can be considered an ATDS. *ACA International v. FCC*, 885 F.3d 687 (D.C. Cir. 2018) ("'Auto' in autodialer—or, equivalently, 'automatic' in 'automatic telephone dialing system,' 47 U.S.C. 227(a)(1)—would seem to envision non-manual dialing of telephone numbers."). In an effort to clarify this ambiguity, the P2P Alliance, a trade group comprised of bipartisan-oriented providers of peer-to-peer text messages, filed before the FCC a "Petition for Clarification" that such messages are not considered to be sent from an ATDS under the TCPA. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC, CG Docket No. 02-278, Petition for Clarification of the P2P Alliance, May 3, 2018.[7]

An adjudication of first impression by this Court that a peer-to-peer text message system is unlawful would have extraordinary impact. Such a decision would effectively rewrite the TCPA by dispensing with the primary statutory element that the system has the capacity to dial. Additionally, a ruling that Defendant violated the TCPA, which would require finding that Opn Sesame's peer-to-peer system is an unlawful autodialer, may destroy this rapidly growing industry and its usefulness to the large number of political campaigns and public interest groups that use such services, as well as subject them directly or indirectly to billions of dollars in aggregate damages. A finding that the Opn Sesame platform used by FFC is an ATDS would have the effect of stifling core political speech protected under the First Amendment by prohibiting the delivery of such speech through an efficient methodology. Given the magnitude of this narrow issue before the Court presented through Plaintiff's claim, combined with the

---

[7] For the convenience of the Court, Defendant has attached this Petition as Exhibit B.

technical analysis required to make such a determination, this matter is appropriate for referral to the FCC for a determination under the doctrine of primary jurisdiction.

### B. The Doctrine of Primary Jurisdiction Indicates that this Matter is Well-Suited for Referral.

The doctrine of primary jurisdiction operates to postpone judicial consideration of a matter "extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." *In re StarNet, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004) (quoting *National Communications Association, Inc. v. AT&T Co.*, 46 F.3d 220, 222-23 (2d Cir. 1995)). It is "a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993) (internal citations omitted). This doctrine "comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *Gen. Am. Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422 (1940).

While the Court should use its discretion to make a referral under the doctrine sparingly, it may do so when there are issues calling for "the expertise of the agency deferred to and the need for a uniform interpretation of a statute or regulation." *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260,1265 (11th Cir. 2000) (internal citations omitted). Factors to be considered in making a referral include whether agency action will aid the litigation; whether the litigation involves conduct requiring continuing supervision by the agency; whether the issues to be litigated are

unique to regulated industries; and whether proceedings already are pending before the agency. *See Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 305-06 (1973) (affirming the staying of a case pending outcome of agency adjudication); *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 68 (1970); *Far East Conference v. United States*, 342 U.S. 570, 574 (1952) ("[I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over.")

Unresolved TCPA questions are particularly well-suited for referral under the doctrine due to the nature of the rapidly emerging technology reliant on a complex regulatory scheme by a federal agency. *See*, *e.g.*, *Charvat v. Echostar Satellite, LLC*, 630 F.3d 459, 466-67 (6th Cir. 2010) (referring matter to the FCC given the agency's expertise, authority, and position to obtain input from industry and consumer stakeholders). In those unique and rare situations, such as the one at issue in this case, where a plaintiff makes a claim on a narrow technical question of first impression that could upend an emerging industry and stifle lawful protected speech, the matter is appropriate for a referral to the FCC.

A referral under the doctrine is materially distinguishable from a stay pending the outcome of an agency order. A stay can be granted for essentially any reason, pursuant to the several factors a court may use to make such a determination. *See Trujillo v. Conover & Co. Commc'ns, Inc.*, 221 F.3d 1262, 1264 (11th Cir. 2000) (A "stay sometimes is authorized simply as a means of controlling the district court's docket and of managing cases before the district court."). However, a referral to an administrative agency under the doctrine of primary jurisdiction is uniquely appropriate "pending resolution of an issue that falls within the special competence of an administrative agency," such as one that poses technical and policy issues

beyond the court's ordinary competence. *Beach TV Cable Co., Inc. v. Comcast of Florida/Georgia*, 808 F.3d 1284, 1288 (11th Cir. 2015). For this reason, a Court's determinations on typical requests to stay a case need not be considered as precedent to the different situation where a party asks for a referral under the primary jurisdiction doctrine.

Moreover, the Court need not likely wait any considerable length of time for resolution on its referral, as the question of whether a peer-to-peer text message system like Opn Sesame is an unlawful autodialer is already set for resolution by the FCC. Indeed, the need for such clarity is precisely why the P2P Alliance, comprised of the bipartisan-focused industry leaders providing peer-to-peer messaging technology and services, petitioned the FCC for resolution on this issue in May of 2018, well before the facts leading to Plaintiffs' claim occurred. Since Opn Sesame is not "automated" under the meaning of the TCPA, a finding that its system is unlawful can only be made by interpreting the statute to somehow modify the statutory requirement that a human sending a text message is instead "automated." By assigning the FCC with the authority to adapt the TCPA to emergent technologies, Congress has effectively delegated these technical questions to that agency. Accordingly, this Court should stay this action and refer this matter to the FCC to conclude its work on the already-pending petition rather than make an intermediate ruling potentially at odds with the agency's conclusion.

A question of first impression as to whether a specific type of dialer constitutes an autodialer should be referred to the FCC. *See*, *e.g.*, *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008) (ordering referral of how a telephone technology should be analyzed under statutory framework). A referral is proper "if a claim requires resolution of an issue of first impression or of a particularly complicated issue that Congress has committed to a regulatory agency and if protection of the integrity of a regulatory scheme dictates preliminary resort to the

agency with administers the scheme." *Id.* (internal citations omitted). The FCC has the authority and expertise to interpret the TCPA and construe its provisions, including the definition of "automatic telephone dialing system" at issue here. *Charvat*, 630 F.3d at 467. While the Court retains full jurisdiction of the case itself under the doctrine, it merely refers the narrow, technical question for resolution by the FCC.

Practically, the considerable magnitude of the Court's determination on this narrow, technical issue advises extreme caution. The technology used by Opn Sesame, and many other peer-to-peer text message providers, has attracted considerable investment and usage throughout the country for rapid deployment of messages of import in furtherance of political discourse. Any limits on the use of a particular medium for distributing core protected speech would likely face serious constitutional challenges (just as Defendant here has asserted). *See Citizens United v. FEC*, 558 U.S. 310, 326-27 (2010) ("Courts, too, are bound by the First Amendment. We must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker. It must be noted, moreover, that this undertaking would require substantial litigation over an extended time, all to interpret a law that beyond doubt discloses serious First Amendment flaws. The interpretive process itself would create an inevitable, pervasive, and serious risk of chilling protected speech pending the drawing of fine distinctions that, in the end, would themselves be questionable.") Further, should this Court rule that Opn Sesame's peer-to-peer text message system, which requires that each message be sent by a human operator, violates the TCPA, it would likely result in dozens of similarly situated companies throughout the country being subject to billions of dollars in potential damages overnight. It could also have the effect of imposing similar liability on groups like the Defendant, political campaigns, public interest groups, social welfare organizations, and

businesses both small and large that engaged their services with the belief that the system was designed and operated in accordance with the TCPA.

Peer-to-peer text messaging is a burgeoning industry operating within a narrow but important nuance of the TCPA. Those clients of such text message providers, such as the Defendant, have relied on the clear language of the TCPA to cause to be distributed text messages to its supporters. This underlying industry, and the services it provides is within the purview of the FCC's regulatory and enforcement authority. The FCC is best positioned to make the analysis of whether the industry should be subject the penalties of the TCPA by altering its previous guidance and enforcement posture. Moreover, a petition regarding similar systems is pending before the agency, so a referral to the FCC is unlikely to produce considerable delay. A resolution on that petition, along with the referral from this court, will inform this Court's analysis of the matter before it.

No prejudice will result for Plaintiff if the matter is referred to the FCC. Nor is there any ongoing harm to Plaintiff. It is Defendant's information and belief that named Plaintiff has already opted out of the receipt of text messages and is not currently receiving text messages. To the extent that he has not opted out, Plaintiff may opt out at any time to discontinue the receipt of further text messages. Additionally, a stay rather than dismissal, it would not prejudice Plaintiff's legal rights. The value of obtaining the FCC's guidance on this narrow technical issue considerably outweighs any need to bring this matter to trial expeditiously.

## Conclusion

For all of the aforementioned reasons, Defendant Faith and Freedom Coalition, Inc. respectfully requests that this Court grant its motion to dismiss under Rule 12(b)(6) with

prejudice, make a determination in Defendant's favor under Fla. Stat. §768.295, awarding costs and attorney's fees to Defendant, and grant such other and further relief as the Court deems just.

Alternatively, the question before this Court—of whether FFC's usage of Opn Sesame's peer-to-peer text message system, which requires a human operator to send each text message, is an unlawful automatic telephone dialing system under the TCPA—is well-suited for referral to the FCC under the doctrine of primary jurisdiction. To the extent there is ambiguity in the TCPA as to whether a human-dialed system can possibly be construed as an "automated" dialing system, that ambiguity should be resolved by the agency with delegated congressional authority to provide the industry and stakeholders with technical elements of compliance. Moreover, given the seismic impact on the fledgling industry that a surprise finding that such a system is unlawful, the FCC is best-positioned to provide clear and universally-applicable guidance. Finally, FFC and other clients of peer-to-peer text message providers, such as political campaigns, public interest groups, social welfare organizations, charities, and businesses both large and small would be surprised to learn that their peer-to-peer text message campaign has potentially subjected them to billions of dollars in aggregate liability overnight. For each of the foregoing reasons, Defendant FFC respectfully requests this Court to stay this case pending referral to the Federal Communications Commission to determine whether a peer-to-peer text message system, such as the one utilized by it and other similarly situated clients of vendors providing peer-to-peer text message service, is an unlawful dialing system under the TCPA. Defendant also requests any additional relief to which it may be entitled.

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3), undersigned counsel for Faith & Freedom Coalition, Inc. certify that they have conferred with Plaintiff on November 2, 2018, in a good faith effort to resolve the issues raised in this Motion and can state that Plaintiff opposes the relief requested herein.

Dated: December 3, 2018.

Respectfully submitted,

/s/ *Raquel A. Rodriguez*
Raquel A. Rodriguez
Fla. Bar No. 511439
Christine M. Dimitriou
Fla. Bar No. 99381
Email:rrodriguez@mcdonaldhopkins.com
Email:cdimitriou@mcdonaldhopkins.com
MCDONALD HOPKINS LLC
Southeast Financial Center, Suite 2600
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 704-3990
Facsimile: (305) 704-3999

*And*

Steve Roberts (VA 77248) *Pro Hac Vice*
Dennis W. Polio (DC 198054) *Pro Hac Vice*
HOLTZMAN VOGEL
JOSEFIAK TORCHINSKY PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Telephone: (540) 341-8808
Facsimile: Fax: (540) 341-8809
**E-mail: sroberts@hvjt.law**
**E-mail: dwpolio@hvjt.law**
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of December, 2018, I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system. I further certify that the foregoing document was served via transmission of Notice of Electronic Filing generated by CM/ECF to any and all active CM/ECF participants in the attached service list.

*/s/ Christine M. Dimitriou*
Christine M. Dimitriou

<u>**SERVICE LIST**</u>

**<u>H</u>IRALDO P.A.**
Manuel S. Hiraldo, Esq.
Florida Bar No. 030380
401 E. Las Olas Boulevard
Suite 1400
Ft. Lauderdale, Florida 33301
**mhiraldo@hiraldolaw.com**
Telephone: 954.400.4713

**EISENBAND LAW, P.A.**
**515** E. Las Olas Boulevard, Suite 120
Ft. Lauderdale, Florida 33301
Michael Eisenband
Florida Bar No. 94235
**MEisenband@Eisenbandlaw.com**
Telephone: 954.533.4092

**IJH LAW**
14 NE First Ave.
10th Floor Miami,
FL 33132
Ignacio J. Hiraldo
Florida Bar No. 56031
Email: **ijhiraldo@ijhlaw.com**
Telephone: 786.351.8709

**Hedin Hall LLP**
1395 Brickell Ave, Suite 900
Miami, FL 33131
Frank S. Hedin
Email: fhedin@hedinhall.com
Telephone: 305.357.2107

**Holtzman Vogel Josefiak Torchinsky PLLC**
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Stephen Roberts
*(Admitted Pro Hac Vice)*
**SRoberts@hvjt.law**
Dennis W. Polio
*(Admitted Pro Hac Vice)*
**dpolio@hvjt.law**